**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**MELISSA RIGGIO**                                                **CIVIL ACTION**

**VERSUS**                                                           **NO. 22-00643**

**KILOLO KIJAKAZI**                                          **SECTION: "P" (4)**
**ACTING COMMISSIONER SOCIAL SECURITY**
**ADMINISTRATION**

## REPORT AND RECOMMENDATION

This is an action for judicial review of a final decision of the Commissioner of Social Security pursuant to Title 42 U.S.C. § 405(g). The Commissioner denied Melissa Riggio's ("Riggio") claims for Disability Insurance Benefits under Title II of the Social Security Act, Title 42 U.S.C. § 1382(c). The matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b) and Local Rule 19.02E(b), for the submission of Proposed Findings and Recommendations.

I.    **Factual Summary**

Riggio is a forty-five-year-old woman who alleges disability as a result of depression, bipolar and related disorders, anxiety and obsessive compulsive disorder and personality disorder which began on May 1, 2018. Rec. Doc. 17, p. 10. On March 20, 2020, Riggio filed an application for Disability Insurance Benefits under Title II of the Social Security Act, alleging disability that began on July 20, 2019. Rec. Doc. 17, p. 186. The claim was initially denied on October 26, 2020. Rec. Doc. 17, p. 72. Her claim was denied after being reconsidered on February 18, 2021. Rec. Doc. 17, p. 69-82.

Riggio, thereafter, submitted a request for hearing on April 9, 2021. Rec. Doc. 17, p. 179-180. The hearing took place on July 26, 2021, by telephone, due to extraordinary circumstances presented by COVID-19. R. Doc. 17, p. 132-145.

Thereafter, on January 12, 2022, the ALJ found that Riggio met the insured status requirements through September 30, 2023. Finding 1, Tr. 17. The ALJ further found that Riggio did not engage in substantial gainful activity during the period from his alleged onset date of June 1, 2019 the alleged onset date. Finding 2, Tr. 16. At Finding 3, the ALJ further found the following severe impairments: bipolar disorder, panic disorder, anxiety, depression, lumbar impairment and obesity. Finding 3, Tr. 17.

To support this finding, the ALJ referenced the medicals "discussed herein, limited her ability to perform basic work and was severe within the meaning of her medically determinable impairments." *Id*. While not discussed in Finding 2, the ALJ did discuss the medicals on page 16 noting that she received consistent mental health treatment through the Rosenblum Behavioral Health Clinic during the period at issue. He noted that she began seeking treatment on June 18, 2019, through October 2021. The ALJ noted the periods of exacerbation and improvement in her symptoms such as a reduction in panic attacks, behavior, and mood.

The ALJ further held that through the date last insured, Riggio did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. Finding 4, Tr. 17, p. 13.

The ALJ found that through the date last insured and the date of the decision, Riggio did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Finding 5, Rec. Doc. 17, Tr.14. The ALJ found that through the date last insured and the date of the decision, Riggio had the residual functional capacity to perform sedentary work as defined in 20 C.F.R § 404.1567(a), except she is precluded from climbing ladders, ropes and scaffolds. Further, the ALJ found that the claimant is able to climb

ramps and stairs, kneel, stoop, crouch, and crawl occasionally. The ALJ found she is able to perform detailed but not complex tasks with few, if any, changes in a routine work environment and occasional interaction with the general public, coworkers and supervisors. Rec. Doc. 17.

The ALJ found that Riggio is unable to perform any past relevant work. Finding 6, Tr. 19. The ALJ found that Riggio was born on July 13, 1978. Finding 7, Tr. 19. The ALJ found that Riggio had at least a high school education, and that transferability of job skills was not an issue resulting from disability because using the Medical-Vocational Rules supports a finding that Riggio is "not disabled", whether or not she has transferable job skills. Finding 8-9, Tr. 20.

The ALJ found that considering Riggio's age, education, work experience and residual functional capacity, that there are jobs that exist in significant numbers in the national economy that she can perform. Finding 10, Tr. 20.

Riggio now challenges the ALJ's decision that she was not under a disability as defined in the Social Security Act from May 1, 2018, the alleged onset date. Riggio contends that the ALJ's finding that the treating source was not persuasive is not based on or supported by substantial evidence. Rec. Doc. 20, p. 4. Riggio alleges that the ALJ failed to follow proper procedure at Step 3 because he failed to assess whether her impairments equaled §§12.04 and/or 12.06 Listings. Rec. Doc. 20, p. 5.

 Finally, Riggio alleges that the ALJ improperly denied her application at Step 5 because her assessment of mental limitations failed to incorporate restrictions and improperly presumed an ability to work in the VE hypothetical. Rec. Doc. 20.

## II.  <u>Standard of Review</u>

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is to determine

whether there is substantial evidence in the record to support the determination of the fact finder. The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the Secretary. *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981). If supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971) (citing 402 U.S.C. § 405(g)); *see also Wilkinson v. Schweiker*, 640 F.2d 743, 744 (5th Cir. 1981).

Substantial evidence is more than a scintilla and less than a preponderance and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion. *See Richardson*, 402 U.S. at 401. It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "contrary medical evidence." *See Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973).

The concept of disability is defined in the Social Security Act, as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted . . . for a continuous period of not less than twelve months." *See* 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). Section 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is capable of engaging in any substantial gainful activity, the Secretary applies a five-step sequential evaluation process. The rules governing the

steps of this evaluation process are: (1) a claimant who is working and engaging in a substantial gainful activity will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if a claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether is he can do other work. *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The burden of proof is on the claimant for the first four steps but shifts to the Secretary at step five. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

## III.    Analysis

### A.    Treating Source Medical Opinion

Riggio contends that the ALJ's reliance on the persuasiveness of the treating medical opinion was in error because he relied upon irrelevant evidence and failed to rely upon relevant evidence. Riggio contends that the ALJ's failure to rely on her treating psychiatric nurse, Steven Cessna, PMHNP's findings of mild to extreme limitations across a wide range of work-related abilities and at least marked limitations in the four functional domains renders the decision not based upon substantial evidence.

Riggio contends that had Cessna's opinion been deemed persuasive, her disability would have been approved at either Steps 3 or 5. Rec. Doc. 20. Riggio further contends that the reliance on her orthopedist's notes nearly a year before the alleged onset date, does not constitute substantial evidence in support of the ALJ's determination.

The Commissioner contends that while Riggio may have preferred a different outcome, she is mistaken in her effort to seek a different outcome on judicial review. The Commissioner states that it is solely in the province of the court to decide disability. Rec. Doc. 21. The Commissioner contends that the ALJ properly considered the opinion of Mr. Steven Cessna ("Cessna"), the psychiatric-mental health nurse practitioner whose mental status examinations were "relatively normal." *Id.*

In *Newton v. Apfel*, the Fifth Circuit held that absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ is required to consider each of the factors under 20 C.F.R. § 404.1527(d)(2) before declining to give any weight to the opinions of the treating specialist. *Newton v. Apfel,* 209 F.3d 448 (5th Cir. 2000). Section 404.1527(d)(2)6 requires consideration of: (1) the physician's length of treatment of the claimant,(2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole, and (6) the specialization of the treating physician. The regulation is also construed in Social Security Ruling ("SSR") 96–2p,7 which states in relevant part:

[A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight. *Martin v. Astrue,*

2013 WL695074 (E.D. La. 2013).

In contrast, a finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Stelly v. Astrue,* 2010 WL 5105160 (M.D. La. Dec. 9,2010.)*.* Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

The medical source opinion that is at issue was completed by Steven Cessna on October 1, 2021. The psychological evaluation form was prepared by Riggio's attorney. Cessna diagnosed Riggio with bipolar disorder with severe depression, panic disorder and agoraphobia with panic disorder. R. Doc. 17, p. 709. He found that she had marked limitations in her ability to understand, remember or apply information. *Id*. He also found that her limitations were extreme in her ability to interact with others, concentrate, persist or maintain pace and adapt or mange herself. *Id*.

He also found that she was markedly impaired in her ability to complete a normal workday and respond appropriately to supervision, coworkers, and unusual situations. Rec. Doc. 17, p. 712. He found that she was mildly impaired in her ability to carry out single job instructions making simple work related decisions and moderately impaired in her ability to adapt to change in work routine. *Id*.

The ALJ found that the treatment notes reflect relatively normal mental status examinations with medication noted as worsening in symptoms in the context of situational stressors, including divorce but eventually returning to baseline based upon progress notes. *Id*.

The ALJ also found that Riggio also has a history of lumbar pars defects and lumbar radiculitis, as well as lumbar tear, and there is no evidence to establish limitations beyond those assessed herein. *Id*.

As for the medical opinion and prior administrative medical findings, the ALJ found that he could not defer or give any specific evidentiary weight including controlling weight to any prior administrative medical findings or medical opinions. The ALJ found that the October 2021 statement by Steven Cessna was not persuasive because it was not supported by his own treatment notes which reflected largely intact mental status examination findings. The ALJ further found that Cessna's finding was inconsistent with the other evidence which also reflected benign mental status findings. *Id*. at 19. Finally, the ALJ stated that he has fully considered the medical opinions and prior administrative medical findings in the record. *Id*.

While undergoing treatment for her lumbar spine she also sought mental health care from the Rosenblum Behavioral Health Clinic on August 18, 2019. Rec. Doc. 17. During this visit, she was crying uncontrollably, made no eye contact, was shaking, and complaining of severe pain due to her lower back which indicated interfered with her life. *Id*. at 442. Cessna noted that she reported difficulty sleeping, isolation, fatigue, and feelings of worthlessness. She also reported suicidal ideations, panic attacks, and symptoms consistent with PTSD. *Id*.

She, however, had not ever been psychiatrically hospitalized. *Id*. at 444. She reported a history of taking Xanax which was effective, and Aleve which did not help much. She also indicated that Prozac and Seroquel were also helpful. *Id*. Riggio's reports of depressive episodes were inconsistent as she reported at least one and later reported multiple. *Id*. She also reported gaining 30lbs over the past year due to depression. *Id*. She was noted as appearing morose, yet attentive and unhappy with normal speech and articulation. *Id*. He observed signs of severe

depression, noting that she was tearful with a general demeanor of a depressed mood. There were no signs of hallucinations, delusions or bizarre behaviors or other psychotic process. *Id*.

While she wished to be dead, she denied suicidal ideas or intentions which he believed. *Id*. at 448. He did not test her cognitive functioning, but he concluded it was clinically unchanged from previous examinations and noted that her fund of knowledge was in normal range. *Id*. He further concluded that her insight and judgment appeared fair. *Id*. He also noted the absence of hyperactive or attention difficulties although she had poor eye contact. *Id*. She was diagnosed with major depressive disorder, recurrent and anxiety disorder. She was prescribed Prozac and increased the dosage to 60 mg, Vistaril 25 mg for her anxiety to help out with the Xanax that she was prescribed, and Seroquel 300 mg as an adjunct for depression and anxiety. *Id*. at 449. She was counseled about her weight. *Id*. at 450.

On January 17, 2020, she was seen again and reported "definite improvement" with Latuda medication. She continued to reported anxiety symptoms although fewer and less intense. *Id*. at 451. The doctor noted a recent decrease in episodes of intermingled manic symptoms, and she denied suicidal ideas, which the doctor believed. *Id*. She denied anger and there was no mania, hallucinations, delusions or other psychotic symptoms present. *Id*. He noted that her domestic skills, relationships with family and friends are normal. *Id*. However, her ability to function at work was noted as marginal. *Id*. She maintained sobriety but reported angry outbursts, impulsive behavior but less frequently. *Id*. Her insight into problems was noted as poor but her judgment was fair with signs of anxiety. *Id*.

On this date, she was diagnosed with anxiety and bipolar disorder, and severe episode depression, without psychotic features. *Id*. Her medication of Latuda was increased to 40 mg due to partial improvement, and she was encouraged to go to counseling. *Id*. In addition to Latuda

(for anxiety), she was continued on Seroquel (for mood), Gabapentin (for anxiety), Prozac (for depression/anxiety), Atarax (for anxiety), Xanax (for severe anxiety), Alprazolam (for severe anxiety), Fluoxetine (for depression), Quetiapine (for mood), and Hydroxyzine (for anxiety). *Id.* at 453. She was instructed to return for a three month follow-up. *Id.*

On April 30, 2020, during COVID-19, she participated in a telehealth visit and reported that her current anxiety medications were "barely getting her through the day." *Id.* at 455. She appeared with worsening "fears, anxiety and panic attacks." She reported that her PCP instructed her to talk to her about feeling "on the verge of a breakdown." *Id.* She reported an increase in frequency or intensity of anxiety symptoms, sleep disturbance due to anxiety with episodes of irritability. *Id.* He noted a depressed mood with manic symptoms and racing thoughts.

He noted that her selfcare, domestic skills and relationships skills were intact. *Id.* Riggio reported that her impulsive behaviors were occurring but less frequently. *Id.* While here was evidence of mild depression and anxiety with no signs of hyperactive or attentional difficulties. *Id.* Riggio was noted as cooperative and attentive with no gross behavioral abnormality. *Id.* Her associations were intact, thinking logical and thought content appropriate. *Id.* Her diagnosis was anxiety disorder, bipolar disorder, current and severe episode depression, ruling out borderline personality disorder. *Id.* at 458.

She was continued on Latuda which was increased to 80 mg, and Prozac, Gabapentin, Seroquel, Atarax, Xanax, and she was started on Clonidine. *Id.* at 459. She was instructed to continue with treatment. *Id.*

On July 23, 2020, Riggio was seen at Rosenblum Behavioral Health Clinic where she reported "things are going good, I'm okay." The Clonidine medication was found effective, and she had been home with her kids since the pandemic began. She reported less anger and fewer

angry episodes with intermingled manic symptoms that have recently lessened. *Id*. at 466. She reported that her sleep problems recently diminished, and she denied suicidal ideas. *Id*. at 466. She reported fewer panic attacks. *Id*. The doctor noted that signs of moderate depression were present and her thought content was depressed with signs of anxiety. He further noted that she was cooperative and attentive, with no gross behavioral abnormalities or signs of withdrawal or intoxication. *Id*. at 467. Her diagnosis was anxiety disorder, bipolar disorder with current severe episode depression without psychotic features, ruling out borderline personality disorder. *Id*.

In October 2020 she had another telehealth visit. Moderate depression was observed, but her functioning was intact, and she had fair judgment with no signs of withdrawal or intoxication. *Id*. at 487. Her diagnosis remained the same, and her medication of Seroquel was adjusted but all other medications remained the same. *Id*.

On December 1, 2020, her anxiety was noted as present. Riggio complained of instability of self-image as chronic feelings of emptiness or boredom. *Id*. at 512. She reported persistent and marked identity disturbance which is manifested by life's uncertainties. *Id*. Her self-care was intact and unimpaired. *Id*. Her cognitive functioning went unchecked on that day, and it was concluded that she appeared to be clinically unchanged from previous examinations.

On February 23, 2021, Riggio participated in a med-check appointment and reported that she was having a rough time lately due to having had COVID-19. *Id*. at 639. She reported not sleeping well, had depressive moods and anhedonia with excessive worrying and fatigue. *Id*. The doctor observed anxiety symptoms, which he described as present, but her cognitive function was clinically unchanged, her associations were intact, her domestic skills were intact with no outbursts or expressions of anger with not confusion, and intact selfcare skills. *Id*.

Her treatment continued through July 28, 2021, and during this visit she reported that the

medications were effective and that she understood that her recent stressful situation was not a reason to make medication changes. *Id*. at 685. Riggio reported that she is scheduled for frequent counseling and peer support. *Id*. She continued to report panic attacks once a day. *Id*. She described no symptoms of mania. *Id*. It was noted that her selfcare and domestic skills were intact and unimpaired. *Id*. Her affect, however, was appropriate and mood congruent, and her short and long-term memory were intact. Id. During her session, Riggio was found cooperative and attentive, with no gross behavioral abnormalities. *Id*.

In July 2021, she was still experiencing anxiety, which is manifested by avoiding certain settings, and panic attacks in certain situations. *Id*. at 700. Her diagnosis remained the same and included anxiety and bipolar disorder, and current severe episode depression, ruling out borderline personality disorder. *Id*. at 706. On August 23, 2021, Cessna determined Riggio needed outpatient treatment, noting that she exhibits symptoms of an emotional disorder, that interfere with day to day functioning. He noted that she was overwhelmed because of her family getting COVID-19, and she reportedly had thoughts of death and had not bathed in a week. He concluded she has a depressed mood, which is an active problem needing treatment. He recommended that she seek out a therapist. *Id*.

A review of the medical records for Riggio indicates that during the entire period of her treatment, she would have episodes, and then with medication adjustments would report that she was doing better. She also was routinely recommended to attend therapy but there are no therapy records in the file.

 Also, between August 2019 and August 2021, Cessna noted that Riggio's domestic skills, and relationships with family and friends were normal. *Id*. at 451, 455. He noted, however, that her ability to function at work was marginal. He reported in August that she indicated she was

experiencing angry outbursts and impulsive behavior less frequently, her judgment was fair, function and selfcare and domestic skills intact, but anxiety was present. *Id*. at 458, 487, 512, 639, 685.

On October 8, 2020, Riggio reported that her relationships with family and friends were reduced but that she had fewer instances of impulsive behaviors. *Id*. at 485. Her relationships remained reduced through April 2021. *Id*. at 512, 640, 652. Thereafter, in the later part of April 2021, Riggio reported that she interacted well with others. *Id*. at 664. On May 21, 2021, she reported that she was socially withdrawn from friends and family. *Id*. at 681. By July 13, 2021, she reported that her medications were effective while her mood swings had increased and then improved. *Id*.

Despite the mood swings, she reported that she was socializing with family and friends. *Id*. at 686. She was again encouraged to seek out therapy. *Id*. at 696. By August 23, 2021, she reported that she socially withdrew from family and friends who were getting COVID-19. *Id*. at 706-707. The medical records show that Riggio had moderate impairment in her ability to socialize with others as determined by the ALJ. There were periods where she isolated herself, but largely she would socialize even in instances in which she reported a reduction in her socialization with her friends and family. The records do not support an extreme limitation as found by Cessna. [1]

In the area of understanding, remembering or apply information, Riggio contends that the

---

[1] Interact with others (paragraph B2). This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, connection, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples. *See* Rec. Doc. 17, p. 711.

ALJ should have adopted Cessna's limitation. She points out that Cessna assessed her with marked limitations in her ability to understand, remember, and apply information.

Riggio contends that the ALJ relied upon medicals that predate the onset date of her disability: namely June 1, 2019. Rec. Doc. 20. Riggio also contends that regarding the inconsistencies with Cessna's "own treatment notes," these records included objective assessments and conclusions which tended to substantiate Cessna's opinions. *Id*.

Riggio points to one entry in August 2021, where Cessna found that she had ongoing issues with daily depressed moods "to the point of social deterioration as well as mood lability and racing thoughts causing distractibility." *Id*. She points out that Cessna found that she was depressed and exhibited signs of anxiety, and borderline personality disorder with mood instability, and with medication adjustment she reported improvement in December.

The Commissioner contends that the ALJ thoroughly considered Cessna's records of treatment and his opinion, yet the ALJ rejected Cessna's finding. Rec. Doc. 21. The Commissioner argues that Cessna's form was not persuasive because it was not supported by his own treatment notes. *Id*. The Commissioner pointed out that Riggio's records reflected largely intact mental status examination and was inconsistent with other evidence that also reflected benign mental status findings in the context of other treatment. *Id*. The Commissioner does not address the issue regarding review of medicals before the onset date.

According to the record, Cessna, in completing a check box type form concluded that Riggio had marked limitation in her ability to understand, remember, or apply information. Rec. Doc. 17, p. 710. However, there is no indication on the form by the medical support for the finding. *Id*.

In contrast, the ALJ noted that Riggio has a mild limitation. *Id*. at 13. He found that her

mental status examinations consistently demonstrate genitive functioning in the normal range as well as intact memory. *Id*. The claimant reported in her function report that she could follow a recipe but noted that other things may prove to be more challenging. *Id*. The ALJ pointed to two records to support his finding of a mild limitation of mental status examination. *Id*. at 34.

The record the ALJ relied on was dated May 16, 2018, which Riggio contends is before her onset date. *Id*. The record indicates that she was alert and oriented to person and time. She had normal recent and remote memory, and normal immediate and delayed recall. *Id*. Her attention span and concentration was normal, and so was her affect and mood. *Id*.

The other record referenced to support the finding was on February 23, 2021, wherein Riggio indicates that she had been regularly taking her medication, her self-care skills are intact and unimpaired. *Id*. at 640. The record indicates that her domestic skills are intact and unimpaired, but Riggio was socializing less with family and friends. *Id*. Cessna noted that there were no early signs of substance abuse or relapse, and her sobriety was maintained with no reported instances of impulsive behaviors. *Id*. She appeared clam, downcast, attentive, and communicative, but looked unhappy. *Id*.

As to the issue of the scope of the ALJ's review, the disability report indicates that it was believed that Riggio alleged an onset date of May 1, 2018. *Id*. at 260. Her actual application indicates an onset date of July 20, 2019. *Id*. at 181. However, her attorney moved to amend the alleged onset date of disability to June 1, 2019, which was granted. Therefore, Riggio is correct that the ALJ considered at least one medical record before the onset date of her disability when he referenced the record from May 2018. *Id*.

However, he considered records after the alleged onset date including her function report she completed, and conducted a thorough review of the record evidence, including the treatment

by Cessna. *Id*. at 16. He conducted a review of the medicals from June 2019 through July 2021. *Id*. at 17-18. He noted the fluctuation in her mental status exam from cooperative to showing signs of mild depression present. *Id*. at 16. He further noted that her mental status of mild depression was present in April 2021 with a worsening of symptoms in July 2021. *Id*. at 17.

In determining that she had relatively normal mental status examinations due to medications with improvement in symptoms, he also noted that her treatment notes showed worsening symptoms in context of situational stressors. *Id*. He noted that upon follow-up with Cessna on October 8, 2020, Riggio reported her panic attacks were occurring a few times a week, but that her symptoms had slightly improved. He noted that she was cooperative and attentive. In determining that Cessna's limitations finding was not supported by his treatment records, the Court finds that this conclusion is based upon substantial evidence. Although not referenced by the ALJ specifically, this record noted that Riggio reported that things had been okay. *Id*. at 484.

Regarding her ability to understand, Cessna noted on this visit that her cognitive functioning and knowledge were intact and appropriate. Her insight and judgment appeared fair. *Id*. at 485. This finding of her ability to understand, communicate with appropriate language skills remained intact through July 28, 2021. *Id*. at 491-698. Notably, even during visits where Cessna noted that her depression and/or anxiety were active she was communicative, with logical thinking and appropriate thought content. He never noted that she lacked the ability to understand. *Id*. at 692. Even during the August 23, 2021 phone visit, Cessna did not indicate that Riggio lacked the ability to understand, and she was able to communicate her distress to Cessna.

The Court finds that the ALJ's decision to reject Cessna finding of marked limitation in her ability to understand, remember, or apply information is supported by substantial evidence. There were no examples in the records that she had difficulty with her ability to learn or recall or

use information. Therefore, the ALJ's decision opinion that Riggio's limitation in this area was mild is supported by substantial evidence.

Next, regarding her ability to concentrate, persist or maintain pace, it was found to be extremely limited according to Cessna, and only moderately limited according to the ALJ. Regarding this limitation, the ALJ noted in Riggio's testimony that she lacked the motivation to cook and clean, and her mental status examinations of record generally showed minimal signs of attention. *Id.* at 14. The ALJ also noted that Riggio reported in her function report that she liked to read, write and watch television, but that it was hard to sit and do these things for long periods of time.

While Riggio generally complains about the rejection of Cessna's limitations, she fails to present any evidence that supports Cessna's conclusion that she extremely lacked the ability to concentrate or maintain pace. Therefore, the Court finds that the ALJ's finding of moderate limitation in this area is supported by substantial evidence.

Regarding her ability to adapt or mange herself, the ALJ found that she experienced moderate limitation, and Cessna found that she was extremely limited. In support of his decision, the ALJ noted that Riggio has testified that she receives help from her children with tasks around the house. He noted that she was able to drive to pick up her children from school three times a week, she was able to shop for groceries online and pay bills. He also noted that she could handle money.

Riggio seemingly generally disagrees with the ALJ's moderate finding but fails to support her position that she was extremely limited by any evidence of record except Mr. Cessna's opinion. The Court therefore finds that the ALJ's decision to reject Cessna's extreme finding of limitation in Riggio's ability to adapt or manage herself is supported by substantial evidence.

Consequently, the undersigned finds that the ALJ's decision rejecting Cessna's opinion as to Riggio's limitations is supported by substantial evidence. Substantial evidence supported the ALJ's determination that Mr. Cessna's statement of October 2021 that Riggio is not persuasive or supported by substantial evidence because it was not supported by medical evidence of record.

### B. Step 3 Finding- Listing Level Impairment

Riggio next complains that the ALJ failed to follow the proper legal procedure at Step 3. Rec. Doc. 20. Riggio contends that the Commissioners psychological expert who found that she could perform semi-skilled work is a vocational not medical finding. Further, Riggio contends that the ALJ erred when his hypothetical did not incorporate any of the specific limitations assessed by the Commissioner's own experts even though the ALJ found moderate limitations affecting various domains. *Id*. at 10. Riggio contends that had her treating source opinion been found persuasive that she would have been found to meet the listings.

The Commissioner contends that the ALJ's opinion at Step 3 is based upon substantial evidence because he relied on the objective medical evidence to determine whether Riggio satisfied the criteria in the regulations. The Commissioner contends that the ALJ addressed Riggio's argument that she met Listings 12.04, 12.06 and found that she did not because she did not have extreme or two marked limitations in the broad areas of functioning.

For example, Riggio points out that on October 8, 2020, she reported panic attacks several times a week. She was noted as exhibiting symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior and interpersonal relationships. Rec. Doc. 17, p. 485. The records indicated that she expressed great difficulty in tolerating being alone. *Id*.

Riggio highlights a treatment note dated April 21, 2021, where her anxiety was manifested by agoraphobia which means the avoidance of certain settings and social situations, with marked distress in certain situations. *Id*. at 661. On August 23, 2021, Riggio's records indicate that she continued to need outpatient treatment and exhibited symptoms of an emotional disorder, and depressed mood. Her depression was exhibited by feelings of worthlessness with complaints of feeling sad or empty, with excessive or inappropriate guilt. *Id*. However, Riggio notes that none of these findings were included with the ALJ's factual decision. *Id*.

Riggio points out that while the ALJ limited his assessment to a three month period, while her treatment continued for an eighteen month period. Namely, in October 2020 the medical records indicate that while her mood improved, her anxiety showed no improvement. She was noted as experiencing excessive worrying, restlessness and panic attacks occurring a "few times per week." Rec. Doc. 20. Riggio also points out that she reported anhedonia or lack of motivation. Also, on mental status examination, her thought content was depressed, and she was observed as tense, with objective signs of anxiety. Rec. Doc. 17, p. 485-86; R. Doc. 20.

The Commissioner contends that the ALJ's determination at Step 3 was proper. Rec. Doc. 21. The Commissioner contends that the ALJ relied upon the objective medical evidence and determined that Riggio had no more than moderate limitations in each of the four broad functional areas. *Id*. The Commissioner also contends that Riggio only met some portions of the listing requirements and not all of the requirements. *Id*. Finally, the Commissioner contends that Riggio failed to meet her burden that she met or equaled all of the requirements for the listing, and the ALJ's finding at Step 3 is supported by substantial evidence.

At Step 3, the ALJ determined that Riggio had impairments, which he discussed within the opinion. He determined that they were non-severe because they were no more than slight

abnormalities having minimal effect on her that they would not be expected to interfere in her ability to perform work-related activities. He further reiterated that he considered her medically determinable impairments.

To meet Listing 12.04 for depressive, bipolar and related disorders, a claimant must establish the criteria of paragraphs A and B or the criteria of paragraphs A and C. 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.04. The paragraph A criteria requires medical documentation of either depressive disorder, characterized by five or more specified symptoms, or bipolar disorder, characterized by three or more specified symptoms. *Id*. at 12.04(A)(1), (2).

Paragraph B requires an extreme limitation in one, or marked limitation in two areas of mental functioning, which include (1) understanding, remembering or applying information, (2) interacting with others, (3) concentrating, persisting or maintaining pace, and (4) adapting or managing oneself. *Id*.

Paragraph C requires a medically documented history of the existence of the disorder over a period of at least two years, with evidence of both (a) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (b) marginal adjustment, that is, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life. *Id*.

The "Listing of Impairments ... in appendix 1 of subpart P of part 404 of" chapter 20 of the Code of Federal Regulations "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Listing 12.06 describes "[a]nxiety and obsessive-compulsive disorders" that the SSA considers disabling. *Id*. at 404, subpt. P, app. 1, § 12.06. Like other listings for mental disorders, listing

12.06 "ha[s] three paragraphs, designated A, B, and C[.]" Id. § 12.00(A)(2). To meet or medically equal this listing, a claimant must satisfy the paragraph A criteria and either the paragraph B or paragraph C criteria. *Id*. at §§ 12.00(A)(2), 12.06.

Paragraph A requires medical documentation of an anxiety disorder, panic disorder or agoraphobia, or obsessive-compulsive disorder. *Id*. at § 12.06(A)(1)–(3). Paragraph B requires one "[e]xtreme limitation" or two "marked limitation[s]" in "the following areas of mental functioning": (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id*. at § 12.06(B)(1)–(4).

An individual with an "[e]xtreme limitation" in one of these areas is "not able to function in th[e] area independently, appropriately, effectively, and on a sustained basis." *Id*. at § 12.00(F)(2)(e). A "[m]arked limitation" means an individual's "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. § 12.00(F)(2)(d). By contrast, a "[m]oderate limitation" means an individual's "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is fair." *Id*. at § 12.00(F)(2)(c).

Paragraph C requires a showing that the individual "ha[s] a medically documented history of the existence of the disorder over a period of at least 2 years" and "evidence of both:" (1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the individual's] mental disorder ..."; and (2) "[m]arginal adjustment," which means "hav[ing] minimal capacity to adapt to changes in [one's] environment or to demands that are not already part of [the individual's] daily life ...." *Id*. at § 12.06(C)(1)–(2).

The ongoing medical treatment criterion in paragraph (C)(1) is satisfied "when the medical evidence establishes that [the claimant] obtain[s] medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition." *Id*. at § 12.00(G)(2)(b). The marginal adjustment criterion in paragraph (C)(2) is satisfied "when the evidence shows that changes or increased demands have led to exacerbation of [the claimant's] symptoms and signs and to deterioration in [the claimant's] functioning[.]" *Id*. at § 12.00(G)(2)(c). "[F]or example, [the claimant] ha[s] become unable to function outside of [their] home or a more restrictive setting, without substantial psychosocial supports ...." *Id*. Psychosocial supports may include "receiv[ing] help from family members or other people who monitor [the claimant's] daily activities and help [the claimant] to function." *Id*. at § 12.00(D)(1)(a).

In reviewing Finding 3, the ALJ made a medical assessment although he did not detail his review at step 3. He indicated however, at step 3, that his decision was based upon his review of the medical records. He did, however, conduct a review of the medicals within the opinion that supports his finding as to the severity of the impairments. Riggio fails to point to a specific error by the ALJ who  conducted an exhaustive review of the medicals which he considered in determining the basis for his denial. Could he have detailed the medical assessment under Step 3, yes, but his decision to incorporate by reference his medical record review does not invalidate his review, nor does it render the opinion lacking in substantial evidence. A clear reading of the opinion is that Riggio did not meet the extreme limitation, nor did she meet the two marked limitation requirements after reviewing the records.

Riggio also complains that the ALJ ignored her counsel's request for testimony from a medical expert on the grounds that the impairments could have medically equaled a listing.

There is no indication and nor does Riggio suggest that her counsel raised the issue again at the hearing which Riggio's counsel construed as constructively denied. It is undisputed, however, that calling a medical expert is within the discretion of the ALJ. Instead, the ALJ reviewed the medical records of the state agency reviewing medical experts. Further, while Riggio complains about the fact that she met the listing requirements, she does not cite to any record supporting such a finding. The only possible record would have been Cessna's limitation finding which was discussed at great length earlier in the opinion. The ALJ's decision at Step 3 is based upon substantial evidence.

### C.    Step 5 Determination-Mental Limitations

Riggio contends that the ALJ improperly denied her application at Step 5 because he failed to incorporate restrictions, which she accepted, and he hypothetically improperly presumed an ability to work on a sustained fulltime basis. Rec. Doc. 20. Riggio points out that the ALJ and the state experts found that she was moderately limited but the ALJ's hypothetical did not incorporate his own limitations. *Id*.

The Commissioner contends that although the ALJ's hypothetical was not identical to the State agency physicians' opinions, they both agreed that she was not disabled and could work. the ALJ's. The Commissioner contends that the ALJ is free to incorporate only those limitations consistent with the evidence as a whole. The Commissioner contends that the ALJ properly accounted for moderate limitations by Riggio when he detailed that she could do moderate but not complex tasks, with a few changes in a routine work environment, and occasional interaction with the general public, coworkers, and supervisor.

After detailing the medical evidence, state agency and consultative examination findings, as well as Cessna's records and opinion, the ALJ found that Riggio's medically determinable

impairments could cause some of the symptoms. However, he found that her statements as to the intensity, persistence, and limiting effects are not entirely consistent with the medical records and other evidence in the record. He proceeded to explain the reason for his decision.

However, Riggio suggests that the ALJ was required to incorporate the specific limitations found in his hypothetical to the vocational expert. In essence, Riggio is referring to her attorney's addition limitations that would be necessary in order for the ALJ to reach a disability finding including the presence of acute symptoms that would require Riggio to miss all or part of the workday, to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to accept instructions and respond and respond to changes in the work setting appropriately. Rec. Doc. 17, p. 64. The VE responded that based upon those assumed limitations, performance up to one third of the day would be unsatisfactory performance. *Id*. With one or more of these limitations, the VE found that she would not be able to work in the occupations that he cited. *Id*.

An ALJ's hypothetical is "defective unless[:] (1) it incorporates reasonably all disabilities of the claimant recognized by the ALJ, and (2) the claimant or [his] representative is afforded the opportunity to correct deficiencies in the hypothetical." *Bellow v. Chater*, 66 F.3d 323, 1995 WL 534955, at *1 (5th Cir. Aug. 16, 1995) (unpub.) (citing *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir.1994) ("Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on

such a defective question cannot stand.")).

Riggio points to no authority in this circuit requiring an ALJ to expressly name the recognized severe impairments in a hypothetical posed to a vocational expert. To the contrary, the limitations recognized by the ALJ in his decision were reasonably incorporated into the hypothetical posed to the vocational expert.

Upon considering Riggio's position, the Court finds that the ALJ properly incorporated the recognized limitations in the hypothetical question as opposed to all of the limitations referenced in paragraph B in the RFC.

> Assume an individual with the claimant's age, education and work experience who can perform sedentary work, occasionally kneel, stoop, crouch and crawl, occasionally climb ramps and stairs, never climb ladders, ropes or   scaffolds and can perform detailed but not complex tasks with few if any changes in a routine work environment and occasional interaction with the general public, coworkers and supervisors.

The Court finds that the ALJ properly incorporated the limitations that Riggio accepted. The ALJ reasonably accounted for any moderate limitations by Riggio, which is the ALJ's sole responsibility. The Court is of the opinion that the ALJ properly interpreted the medical evidence to determine Riggio's capacity to work, such that the decision at Step 5 is based upon substantial evidence.

## IV.    <u>Recommendation</u>

Accordingly,

**IT IS RECOMMENDED** that the ALJ's decision denying Melissa A. Riggio's claim for Disability Insurance Benefits and Title II Disability be **AFFIRMED.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days**

after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted

by the district court, provided that the party has been served with notice that such consequences

will result from a failure to object. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415,

1430 (5th Cir. 1996).

New Orleans, Louisiana, this 18th day of July 2023

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**